UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

In re:                                              :

                                                    :        Chapter 11

WAYPOINT LEASING HOLDINGS LTD.,                      :

*et al.*,                                           :        Case No. 18-13648 (SMB)

                                                    :

                    Debtor                          :        Jointly Administered

------------------------------------------------------X

MACQUARIE ROTORCRAFT LEASING                        :        Adv. Proc. No. 19-01107 (SMB)

HOLDINGS LIMITED,                                   :

                                                    :

                    Plaintiff,                      :

                                                    :

          - against -                               :

                                                    :

LCI HELICOPTERS (IRELAND) LIMITED,                  :

                                                    :

                    Defendant.                      :

------------------------------------------------------X

## MEMORANDUM DECISION GRANTING DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED ADVERSARY COMPLAINT WITH PREJUDICE

**A P P E A R A N C E S:**

PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166

      G. Alexander Bongartz, Esq.
         Of Counsel

      -and-

71 S. Wacker Drive, Suite 4500
Chicago, Illinois 60606

      Chris L. Dickerson, Esq.
      Mark D. Pollack, Esq.
      Nathan S. Gimpel, Esq.
      Michael C. Whalen, Esq.
        Of Counsel

*Attorneys for Plaintiff Macquarie Rotorcraft*
   *Leasing Holdings Limited*

MANATT, PHELPS & PHILLIPS, LLP
7 Times Square
New York, New York 10036

    Andrew L. Morrison, Esq.
    Samantha J. Katze, Esq.
    Vincent C. Papa, Esq.
       Of Counsel

*Attorneys for Defendant LCI Helicopters*
   *(Ireland) Limited*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge**

This dispute between two non-debtors arises from the section 363 sale of certain assets (the "WAC 9 Assets") owned by Waypoint Leasing Holdings Ltd. and its debtor affiliates (collectively, "Waypoint" or "Debtors") to non-party Lombard North Central plc ("Lombard"). The Plaintiff Macquarie Rotorcraft Leasing Holdings Limited ("Plaintiff" or "Macquarie") was the stalking horse bidder for substantially all of Waypoint's assets and ultimately, the disappointed bidder for the WAC 9 Assets. Macquarie now blames the loss of the sale and/or a $19.5 million break-up fee and an expense reimbursement capped at $3 million on the Defendant LCI Helicopters (Ireland) Limited ("Defendant" or "LCI").

Macquarie commenced this adversary proceeding seeking damages against LCI in its capacity as assignee of the Debtors and in its own right. (*See First Amended Adversary Complaint*, dated May 14, 2019 ("*AC*") (ECF Doc. # 7).[1] LCI moved to dismiss the *AC* with prejudice. While Macquarie has opposed LCI's motion, it has not

---

[1]    "ECF" refers to the docket in this adversary proceeding. "ECF Main" refers to the docket in Waypoint's chapter 11 cases.

addressed the request for dismissal with prejudice or asked for leave to replead any dismissed claims. Furthermore, the *AC* represents Macquarie's second attempt to plead viable claims.[2] Accordingly, the *AC* is dismissed with prejudice for the reasons that follow.

## BACKGROUND[3]

### A.   The Waypoint Bankruptcy and Sale Process

At all relevant times, Waypoint was engaged in the business of owning and leasing helicopters. The Debtors filed their chapter 11 petitions on November 25, 2018. (¶ 10.) Prior to the bankruptcy filing, the Debtors engaged in an out-of-court marketing process to sell substantially all of their assets.[4] (¶ 11.) LCI was involved in the early stages of the marketing process and signed a non-disclosure agreement ("NDA") on August 29, 2018 which enabled LCI to acquire confidential information from Waypoint relevant to the proposed sale. (¶¶ 11, 12.)[5]

The NDA imposed two limitations on LCI that figure into this dispute. The first limited LCI's use of the confidential information "solely for the purpose of evaluating and participating in discussions with the Company . . . ." (¶ 12; NDA § 2.) The second

---

[2]   Macquarie filed the *AC* in response to LCI's motion to dismiss the original complaint.

[3]   The Background discussion is derived from the *AC* and the documents attached to and/or relied on in the *AC*. The notation "(¶ ___)" refers to the paragraphs in the *AC*.

[4]   The Debtors owned groups of assets segregated into "silos" called Waypoint Asset Cos., or "WACs." Each WAC had its own lenders whose claims were secured by the assets of that WAC. The WACs were differentiated by number, and the assets (or equity) involved in the sale included WACs 1, 2, 3, 5, 6, 8, 9 and 12. (*See Bidding Procedures* p. 3 (defined in the succeeding text).) This matter concerns only WAC 9.

[5]   A copy of the NDA is annexed to the *AC* as Exhibit A.

precluded contact with certain designated persons, including any "creditor . . . or other commercial counterparty of the Company or any subsidiary of the Company regarding the Company or its business [or] assets." (¶ 25; NDA § 4.)  The NDA carved out contact and communications that "may occur in the ordinary course of [LCI's] business" on matters unrelated to LCI's possible transaction with Waypoint, (NDA § 4), and provided that nothing in the NDA "impair[ed]" LCI's "ability to conduct . . . business with any third parties in the ordinary course" so long as LCI did not "disclose or refer to" its potential transaction with Waypoint or confidential information obtained pursuant to the NDA. (NDA § 2(a).)

On December 7, 2018, Macquarie entered into a Stock and Asset Purchase Agreement ("Macquarie APA") with the Debtors to buy substantially all of Waypoint's assets, including the WAC 9 Assets, for $650 million. (¶ 15; ECF Main Doc. # 64, Ex. C).) Three days later, the Debtors filed their motion to establish bidding procedures and approve the sale. (*Motion of Debtors for Entry of Orders Approving: (I) (A) Bidding Procedures, (B) Bid Protections, (C) Form and Manner of Notice of Auction, Sale Transaction, and Sale Hearing, and (D) Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (II) (A) Sale of Substantially all of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (B) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Related Relief*, dated Dec. 10, 2018 ("*Bidding Procedures Motion*") (ECF Main Doc. # 64); ¶ 16.) The *Bidding Procedures Motion* elicited objections from the Debtors' secured creditors, including Lombard, the creditor secured by a lien on the WAC 9 Assets. After further negotiations among the parties, the

Court entered the *Order Approving (A) Bidding Procedures, (B) Bid Protections, (C) Form and Manner of Notice of Cure Costs, Auction, Sale Transaction, and Sale Hearing, and (D) Date for Auction, if Necessary, and Sale Hearing*, dated Dec. 21, 2018 ("*Bidding Procedures Order*").  (ECF Main Doc. # 159; *see* ¶ 17.)

The bidding procedures attached as Exhibit 1 to the *Bidding Procedures Order* (the "*Bidding Procedures*") set up a process for third-party bidding and credit bidding. Because third parties and/or the secured parties could bid on a WAC-by-WAC basis, Macquarie had to allocate its $650 million bid among the eight WACs.  (*See Bidding Procedures* p. 2.)  After the deadline for third-party bids, the secured parties could credit bid in one of two prescribed forms.  Macquarie was entitled to a breakup fee in the sum of $19.5 million plus an expense reimbursement of up to $3 million under the Macquarie APA, unless, *inter alia*, a transaction was effected through a credit bid. (*Bidding Procedures Order* ¶¶ 8, 10.)  In addition, if Lombard made a credit bid for the WAC 9 Assets in the full amount of its claim, Macquarie could not submit a matching bid.  (*Id.* ¶ 4.)

The *Bidding Procedures* also modified the "no contact" provisions in the NDAs that the secured creditors and prospective bidders, including Lombard and LCI, had signed.  The secured parties could engage in discussions  and negotiations with an entity to manage the assets upon the consummation of a successful credit bid ("Alternative Asset Manager") and were released from any restriction on "engaging in discussions or negotiations" under their agreements with the Debtors, retroactive to December 12, 2018, "*provided*, that the Debtors, WAC Lenders, WAC Facility Agent, and Credit Bidco shall, prior to any disclosure to any such Alternative Asset Manager of any confidential

information, agree (with each such party acting reasonably and in good faith) on the scope of information to be provided to such Alternative Asset Managers (taking into account commercial sensitivities and antitrust and other applicable law)." (*Bidding Procedures* p. 5.)

## B.    The Auction and Sale Hearing

No third party submitted a bid, leaving only Macquarie and the secured lenders as potential purchasers. Lombard submitted a credit bid for the WAC 9 Assets in the amount of 100% of its claim. (¶ 23.) The gravamen of the Plaintiff's claims is that Lombard entered into a secret deal with LCI in violation of the NDA and the *Bidding Procedures* to sell it the WAC 9 Assets following the consummation of the credit bid. (¶ 20.) In Macquarie's view, Lombard's bid was actually a joint, collusive bid by Lombard and LCI that deprived the Debtors of the opportunity to get a higher and better bid, prevented Macquarie from acquiring the WAC 9 Assets and deprived it of its break-up fee and expense reimbursement. (¶ 38.)

Evidence submitted by Lombard in support of the approval of its credit bid provided some evidentiary support for Macquarie's position. In response to Macquarie's limited objection, Lombard filed the affidavit of Ms. Jacqueline McDermott on February 11, 2019. It disclosed that Lombard was "discussing with its servicer a subsequent transaction pursuant to which the [WAC 9 Assets] would be recapitalized and sold to the servicer." (¶ 28.)

At the hearing the next day, Macquarie's counsel framed the issue succinctly: "what they're seeking to do is eliminate the breakup fee." (Transcript of Feb. 12, 2019

6

Hr'g ("Tr."), at 166:16-17 (ECF Main Doc. # 537) (cited in ¶¶ 29-31).)  He did not object

to the receipt of Ms. McDermott's affidavit as her direct testimony, (Tr. 163:14-22), and

then subjected her to a vigorous cross-examination regarding Lombard's negotiations

with servicers to sell the WAC 9 Assets following the consummation of the credit bid.

She testified that from the beginning of Lombard's negotiations with Macquarie as the

Debtors' proposed stalking horse bidder, Lombard made it clear that if Macquarie

wanted to acquire the WAC 9 Assets, "they needed to pay par plus accrued interest."

(Tr. 186:14-20.)  Lombard was a lender, not a helicopter leasing company, (Tr. 194:24-

195:5), and intended to sell the WAC 9 Assets at some point in the future.  (Tr. 189:2-11;

194:3-5.)  Lombard had some preliminary discussions with potential servicers, but the

servicers did not have necessary information about the aircraft or the leases, Lombard

did not disclose any confidential information about the aircraft or the leases, it had no

agreement to sell the assets, and any sale discussions were premature.  (Tr. 187:4-23;

188:22-189:1; 189:12-23; 192:20-194:23.)

   Mr. Matthew Neimann of Houlihan Lokey, the Debtor's financial advisor, also

took the stand and was cross-examined by Macquarie's counsel.  He testified that

Houlihan Lokey never consented to Lombard sharing information regarding anything

other than servicing.  (Tr. 225:15-23; *see* ¶ 30.)

   After all parties rested, (Tr. 226:8-16), the Court heard closing arguments.

Macquarie's counsel maintained that Lombard had violated the confidentiality and "no

contact" provisions of its own non-disclosure agreement ("Lombard NDA") and had

entered into a collusive bidding agreement with LCI.[6]  These actions deprived

Macquarie of its break-up fee and precluded a finding that Lombard had acted in good

faith under 11 U.S.C. § 363(m).  When the Court questioned the sufficiency of the

evidence of Lombard's breach of the confidentiality provisions of the Lombard NDA,

(Tr. 243:19-244:6), Macquarie's counsel suggested that the Court should allow it a brief

period of discovery.  (Tr. 245:3-4.)  When the attention turned to the "no contact"

provision and the hypothesis that Lombard would not have bid but for the agreement to

resell the WAC 9 Assets to LCI, Macquarie's counsel again suggested that more

discovery might be in order.  (Tr. 248:16-21.)

　　　　The Court rejected Macquarie's belated request for discovery.  The possible

violation of the NDA and collusive bidding had been raised by Macquarie in its objection

to the sale of the WAC 9 Assets to Lombard.  (*See Limited Objection of Macquarie

Rotorcraft Leasing Holdings Limited Relating to WAC 9 Credit Bid Transactions and

Related Form of Purchase Agreement and Sale Order*, dated Feb. 5, 2019 ("*Macquarie

WAC 9 Sale Objection*") (ECF Main Doc. # 339).)  In addition, the sale hearing was an

evidentiary hearing under the Court's Local Bankruptcy Rule 9014-2(c), and the process

was expedited by its very nature.  (Tr. 248:22-249:3.)  Macquarie never sought

expedited discovery.

　　　　The Court ruled from the bench at the conclusion of the hearing.  (Tr. 250:8-

253:3.)  It first ruled that Lombard, not Lombard and/or LCI, was the credit bidder for

the WAC 9 Assets and Macquarie was not entitled to a break-up fee based on Lombard's

---

[6]　　　Although potential third-party bidders like LCI and secured creditors like Lombard signed
slightly different NDAs, (Tr. 214:20-23), the material terms were substantially the same.

successful credit bid.  (Tr. 250:8-16.)  The Court also concluded that there was no evidence that Lombard had shared any confidential information with any servicers, including LCI.  (Tr. 250:24-251:9.)

The "no-contact" provision of the Lombard NDA was a different story.  The evidence showed that Lombard had discussed the possibility of a future sale of the WAC 9 Assets with LCI.  However, the Court discounted this possible "technical violation" of the Lombard NDA because it did not affect the bidding process.  (Tr. 251:9-12.) Furthermore, Lombard did not act in bad faith when it started to look around for a subsequent purchaser.  Lombard was a lender that intended to liquidate its collateral and get paid back.  It did not want to incur the costs of insuring the aircraft and paying a servicer.  (Tr. 251:12-21.)

The final ruling concerned Macquarie's objection to the scope of the release that the Debtors were giving to Lombard because Macquarie would be acquiring certain of the Debtors' claims under the Macquarie APA.  The Court observed that the release was consistent with the *Bidding Procedures Order* except that it now was more limited because it excepted claims based on willful misconduct and gross negligence.  (Tr. 251:21-252:1.)  If Macquarie wanted to sue Lombard as the Debtors' successor arguing that Lombard had engaged in the type of conduct carved out of the release, it was free to do so:

> And you can make the argument, Mr. Edelman [Macquarie's counsel], that if you've gotten that claim and somebody knowing violated, I guess, a provision restricting the use of confidential information, they engaged in willful misconduct but that's for another day.

(Tr. 252:2-6.)

The Court signed the order approving the sale of the WAC 9 Assets to Lombard pursuant to their credit bid the next day. (*Order (I) (A) Approving Purchase Agreement Among Debtors and Successful Credit Bidder, (B) Authorizing Sale of Certain of Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, and (C) Granting Related Relief, and (II) Authorizing Debtors to Take Certain Actions With Respect to Related Intercompany Claims in Connection Therewith*, dated Feb. 13, 2019 ("*Lombard Sale Order*") (ECF Main Doc. # 441).) The *Lombard Sale Order* included findings that Lombard's credit bid complied with the *Bidding Procedures Order* and it was the successful bidder for the WAC 9 Assets (*Lombard Sale Order* ¶ G), that Lombard was a good faith purchaser under section 363(m) and had "complied with the provisions of the Bidding Procedures Order, including compliance in all material respects with confidentiality obligations and restrictions under . . . any applicable . . . non-disclosure agreement," and neither the Debtors nor Lombard had "engaged in any conduct that would cause or permit the Purchase Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code." (*Id.* ¶ J.) The Court also found that the sale process resulted in the "highest and best value" for the WAC 9 Assets, (*id.* ¶ H), and was binding on, among others, the Debtors, Lombard and "any affected third parties." (*Id.* ¶ 35.)

Macquarie asserts, upon information and belief, that LCI subsequently purchased the equity of the WAC 9 Assets from Lombard on March 7, 2019. (¶¶ 35-36.) According to section 3.01 of the Amended and Restated Equity and PPN Purchase Agreement attached to and approved by the *Lombard Sale Order*, the purchase price for the WAC 9 Assets as of the expected closing date of February 15, 2019, was $60,464,373.77 plus

€33,588,431.00, corresponding to the amounts owed by the Debtors to Lombard on the U.S. Dollar tranche and Euro tranche, respectively, under the parties' credit agreement. (*Lombard Sale Order*, Ex. A, § 3.01.)  The Court takes judicial notice that as of the close on February 15, 2019, the Euro was equal to $1.1292.  Accordingly, the amount of Lombard's credit bid and the purchase price for the WAC 9 Assets was $98,392,430.06, rounded up to $98.4 million.

The Court signed the order approving the sale of certain other assets to Macquarie on February 14, 2019.  (*Order (I) Approving Purchase Agreement Among Debtors and Macquarie, (II) Authorizing Sale of Certain of Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (III) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (IV) Granting Related Relief*, dated Feb. 14, 2019 ("*Macquarie Sale Order*") (ECF Main Doc. # 444).)  The *Macquarie Sale Order* provides, among other things, that any damages flowing from violations of the *Bidding Procedures* or *Bidding Procedures Order* "arising from intentional misconduct" are preserved, and upon the closing, were assigned to Macquarie pursuant to the terms of the Macquarie APA.  (*Macquarie Sale Order* ¶ 42.)

## B.    This Adversary Proceeding

Macquarie's *AC* asserts three claims.  Count I, asserted in its capacity as assignee of the Debtors, alleges that LCI breached the confidentiality and "no contact" provisions in its NDA with the Debtors through its improper contact with Lombard regarding the sale of the WAC 9 Assets and injured the Debtors "by depriving the Debtors of obtaining potential competing cash bids for the WAC 9 assets and the additional value that such

11

bids may have realized."  (¶ 43.)  Count II, asserted in Macquarie's own right, contends that LCI tortiously interfered with its business relationship with the Debtors under the *Macquarie APA*, and but for LCI's interference, Macquarie would have purchased the WAC 9 Assets or earned a break-up fee.  (¶¶ 46, 49, 51.)  Count III, asserted both in Macquarie's own right and in its capacity as assignee of the Debtors, alleges that LCI colluded with Lombard to control the sale price of the WAC 9 Assets in violation of 11 U.S.C. § 363(n).[7]  (¶¶ 55, 57, 58.)

LCI's *Memorandum of Law in Support of LCI Helicopters (Ireland) Limited's Motion to Dismiss*, dated May 3, 2019 ("*Motion to Dismiss*") (ECF Doc. # 6) and *Reply Memorandum of Law in Further Support of LCI Helicopters (Ireland) Limited's Motion to Dismiss*, dated May 17, 2019 ("*Suppl. Motion to Dismiss*") (ECF Doc. # 9), assert that all of Macquarie's claims should be dismissed with prejudice for failure to state a claim.  In the main, LCI contends that Count I for breach of the NDA fails to allege damages.  (*Motion to Dismiss* p. 20.)  Count II fails to plead the necessary elements of a claim for tortious interference with business relations, namely, the existence of a business relationship that LCI intentionally interfered with, malice or improper means of interference, and damages.  (*Id.* pp. 23-25.) Finally, Macquarie lacks standing to assert a claim for violation of 11 U.S.C. § 363(n).  (*Suppl. Motion to Dismiss* pp. 9-10.)  The limited exception that allows unsuccessful bidders to challenge the "intrinsic fairness" of a transaction does not apply here, where Macquarie agreed to the

---

[7]      Macquarie may have abandoned Counts I and III at oral argument.  At the hearing, counsel for Macquarie stated: "[I]f in fact the record demonstrates that Macquarie's allocation was substantially less than the credit bid, we would focus the Court on the tortious interference claim."  (Audio Recording of June 20, 2019 Hr'g, at 10:47:25 a.m.)  As discussed in the succeeding text, Macquarie's bid for the WAC 9 Assets was substantially less than Lombard's credit bid.

condition in the *Bidding Procedures Order* that it could not match a 100% credit bid made by Lombard.  (*Id.* p. 10.)  Even if Macquarie had standing to bring it, the claim is not supported by any facts.  (*Id.* p. 11.)  Finally, Macquarie is raising the same allegations that the Court heard and rejected when it approved the sale of the WAC 9 Assets to Lombard and Count III is, therefore, barred by collateral estoppel.  (*Motion to Dismiss*, pp. 25-29; *Suppl. Motion to Dismiss*, pp. 10-11.)

Macquarie asserts in opposition that the claims in the *AC* were not actually decided at the February 12 hearing, but rather, were expressly preserved by the Court. (*Macquarie Rotorcraft Leasing Holdings Limited's Objection to LCI Helicopters (Ireland) Limited's Motion to Dismiss*, dated June 7, 2019 ("*Objection*"), pp. 17-18 (ECF Doc. # 10).)  Moreover, collateral estoppel should not apply because Macquarie did not have a "full and fair opportunity to litigate" in that proceeding.  (*Id.* pp. 19-20.) Macquarie asserts that the Court should not consider the numerous facts outside the *AC* raised by LCI in its *Motion to Dismiss* and *Suppl. Motion to Dismiss*.  (*Id.* pp. 11-13.) Macquarie also argues that its claims are adequately pleaded in the *AC* and are not subject to a heightened pleading standard, that it has both direct and derivative standing under the *Macquarie Sale Order* to assert a claim under section 363(n), and that it should be entitled to proceed to discovery.  (*Id.* pp. 2-3, 14-17, 35-36.)

## DISCUSSION

### A.    Jurisdiction

The claims asserted by Macquarie, though based in part on the pre-petition NDA, arise out of the sale of the WAC 9 Assets in this Court pursuant to the *Bidding Procedures Order* and the *Macquarie Sale Order*.  Accordingly, Macquarie's claims

arise in Waypoint's chapter 11 cases or, in the case of Count III, under the Bankruptcy

Code, and this Court has subject matter jurisdiction under 28 U.S.C. §§ 157(a) and

1334(b) and the *Amended Standing Order of Reference,* No. M 10-468, 12 Misc. 00032

(S.D.N.Y. Jan. 31, 2012).  Macquarie has consented to the entry of final orders and

judgments by this Court, (¶ 5), and contends that "LCI irrevocably and unconditionally

consented to submit to the exclusive jurisdiction of this Court for any lawsuits, actions,

or other proceedings arising out of or relating to the NDA."  (¶ 7 (citing NDA § 10).)

## B.    Standards Governing the Motion

In order to survive a motion to dismiss, "a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 570 (2007)).  While the Court must accept all well-pleaded factual allegations

as true, conclusory statements do not suffice.  *Id.*  "Determining whether a complaint

states a plausible claim for relief will . . . be a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.

"[W]here the well-pleaded facts do not permit the court to infer more than the mere

possibility of misconduct," it fails to show that the pleader is entitled to relief.  *Id.* (citing

Fed. R. Civ. P. 8(a)(2)).

In ruling on a motion to dismiss under Rule 12(b)(6), the Court may also consider

"documents attached to the complaint as exhibits, and documents incorporated by

reference in the complaint."  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir.

2010).  If a document is not incorporated into a complaint by reference, "the court may

nevertheless consider it where the complaint 'relies heavily upon its terms and effect,'

thereby rendering the document 'integral' to the complaint." *Id.* (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002))).

To consider such an integral document, there must be no dispute about "the authenticity or accuracy of the document" or "the relevance of the document." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d at 111 (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)). The *AC* attaches the NDA and incorporates by reference and/or relies upon numerous pleadings and orders from the Waypoint bankruptcy cases, including the *Bidding Procedures Motion*, the *Bidding Procedures Order*, the *Bidding Procedures,* the testimony at the February 12, 2019 hearing memorialized in the transcript, and the *Macquarie Sale Order*. The Court may consider these documents in connection with the *Motion*. In addition, the *AC* discusses at length Lombard's acquisition of the WAC 9 Assets but ignores the *Lombard Sale Order*. The authenticity and relevance of the *Lombard Sale Order* is not open to question. It was executed by the Court, filed on the docket and memorializes the Court's findings that form the basis of LCI's collateral estoppel defense. Accordingly, I will also consider the *Lombard Sale Order*.

## C.    Count I: Breach of the NDA

Macquarie brings Count I as assignee of the Debtors alleging a breach of the NDA and stands in the Debtors' shoes. The NDA is governed by New York law, (NDA § 10), and under New York law, a claim for breach of contract must allege "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Glob. Master Fund Ltd. v.*

15

*Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)). "Without a clear demonstration of damages, there can be no claim for breach of contract." *Milan Music, Inc. v. Emmel Commc'ns Booking, Inc.*, 829 N.Y.S.2d 485, 486 (N.Y. App. Div. 2007). A complaint that fails to demonstrate how an alleged breach caused damage to the plaintiff is "fatally deficient." *Gordon v. Dino De Laurentiis Corp.*, 529 N.Y.S.2d 777, 779 (N.Y. App. Div. 1988); *see also Int'l Bus. Machines Corp. v. Dale*, No. 7:11-CV-951 (VB), 2011 WL 4012399, at *4 (S.D.N.Y. Sept. 9, 2011) ("The fatal aspect of defendant's counterclaim is her inability to show damages."). Allegations of damages must consist of more than "boilerplate," and "the pleadings must set forth facts showing the damage upon which the action is based." *Gordon v. Dino De Laurentiis Corp.*, 529 N.Y.S.2d at 779.

Macquarie asserts that LCI breached the NDA by contacting Lombard about the purchase of the WAC 9 Assets following the consummation of Lombard's successful credit bid. (¶¶ 27-29.) Assuming this to be true, Macquarie has failed to allege how those contacts damaged the Debtors. The *AC* speculates that the collusive bidding arrangement between Lombard and LCI induced Lombard to make a credit bid it would not have otherwise made and thus deprived "the Debtors of obtaining potential competing cash bids for the WAC 9 assets and the additional value that such bids may have realized." (¶ 43.)

Assuming that LCI breached the NDA, the suggestion that the Debtors were damaged defies common sense. The WAC 9 Debtors owed Lombard approximately $98.4 million secured by the WAC 9 Assets. Secured creditors typically make credit bids to protect their collateral from a sale at a depressed price. *RadLAX Gateway Hotel, LLC*

16

*v. Amalgamated Bank*, 566 U.S. 639, 644 n.2 (2012). In this case, Lombard credit bid the full amount of the debt. To suggest that it would not have made a credit bid but for LCI's prompting to prevent a sale at a depressed price belies the Supreme Court's observation in *RadLAX* and ignores the entire purpose of the right to credit bid codified in 11 U.S.C. § 363(k).

The *AC* does not allege that Macquarie's cash bid for the WAC 9 Assets was higher, a critical piece of information in determining if the Debtor was damaged, or that Macquarie intended to pay anything more which, in any event, seemed unlikely. Ms. McDermott testified that Macquarie could have purchased Lombard's claim for par plus interest, *i.e.*, the amount of Lombard's credit bid. Had it done so, it could have made its own credit bid. Curious about Macquarie's bid, the Court asked Macquarie's counsel at oral argument what portion of its $650 million bid it had allocated to the purchase of the WAC 9 Assets. Counsel did not know but eventually informed me that Macquarie had allocated 13.2%, or $85.8 million. (ECF Doc. # 13.) In other words, Lombard outbid Macquarie by roughly $13 million to prevent a sale to Macquarie at a depressed price, precisely what Bankruptcy Code § 363(k) is designed to do.

It is equally implausible that a third party would have stepped in and made an offer higher and *better* than Lombard's credit bid. First, the deadline for third-party bids had expired before Lombard made its credit bid and the Debtors had not received any third-party bids. Second, even if a third party could still bid, its bid would have had to exceed Lombard's credit bid by at least $22.5 million. A third party purchase of the WAC 9 Assets would have triggered the *Debtors'* obligation to pay Macquarie a $19.5 million break-up fee plus as much as $3 million as an expense reimbursement. Thus, a

17

third party would have had to bid at least $121 million for the WAC 9 Assets in order for its bid to be higher *and better* than Lombard's credit bid. The suggestion that there were "potential competing cash bids for the WAC 9 assets" in an amount necessary to benefit the Debtors' estates, especially when a third party could have presumably purchased Lombard's secured claim for $98.4 million, exceeds the bounds of wishful thinking.

Accordingly, Count I is dismissed with prejudice.

## D.    Count II:  Tortious Interference with Business Relations

Macquarie, suing in its own right, alleges in Count II that LCI tortiously interfered with its business relations with the Debtors under the Macquarie APA and the various documents governing the bidding. In essence, the collusion between Lombard and LCI prevented Macquarie from acquiring the WAC 9 Assets or, in the event of a successful third-party bid, the $19.5 million break-fee plus the expense reimbursement that the Debtors would have owed.

To state a claim for tortious interference with business relations under New York law,[8] "four conditions must be met: (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Catskill Dev., L.L.C. v. Park Place Entm't*

---

[8]    Both parties cite to New York law on the claim alleging tortious interference with business relations.  (*Objection* pp. 28-34; *Motion to Dismiss* pp. 22-25.)  Therefore, the Court "is not required to conduct a choice of law analysis *sua sponte*, and instead may apply the state law assumed by the parties in their papers."  *Henneberry v. Sumitomo Corp. of Am.*, 415 F. Supp. 2d 423, 440, n.7 (S.D.N.Y. 2006) (citing *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 294 (2d Cir. 1986) (Friendly, J.)).

*Corp.*, 547 F.3d 115, 132 (2d Cir. 2008). Where the plaintiff and defendant are competitors, the plaintiff faces a high bar. "The existence of competition may often be relevant, since it provides an obvious motive for defendant's interference other than a desire to injure the plaintiff; competition, by definition, interferes with someone else's economic relations." *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1104 (N.Y. 2004). If the defendant is a competitor, but "there has been no breach of an existing contract, but only interference with prospective contract rights," the plaintiff must show that the defendant's conduct was not "lawful," in other words, that it amounted to "a crime or an independent tort." *Id.* at 1103. Such "'[w]rongful means' include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract." *Id.* at 1104 (citation omitted). "When a defendant has acted with a permissible purpose, such as 'normal economic self-interest,' wrongful means have not been shown, even if the defendant was 'indifferent to the [plaintiff's] fate.'" *16 Casa Duse, LLC. v. Merkin*, 791 F.3d 247, 262 (2d Cir. 2015) (quoting *Carvel*, 818 N.E.2d at 1103). Thus, a competitor that interferes with the plaintiff's prospective business relations through persuasion to advance its own economic interests does not use the wrongful means necessary to sustain the claim. *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 664 N.E.2d 492, 497 (N.Y. 1996); *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 406 N.E.2d 445, 449 (N.Y. 1980); *Krinos Foods, Inc. v. Vintage Food Corp.*, 818 N.Y.S.2d 67, 68 (N.Y. App. Div. 2006).

Macquarie expected to earn a break-up fee and an expense reimbursement if a third party outbid it. It contends that the collusive bidding arrangement did just that.

19

According to the *AC*,  LCI "acted with malice by dishonestly, unfairly, and improperly breaching its obligations under the NDA" and "by dishonestly, unfairly, and improperly circumventing the Court-ordered bidding procedures," (¶ 48), and that "LCI's conduct targeted Macquarie, its relationship with Debtor, and its anticipated purchase of the WAC9 assets." (¶ 49.)  These alleged breaches prevented Macquarie from "fully and fairly participating in the WAC9 asset sale process, deprived Plaintiff of the benefit of completing the acquisition of said assets under the Macquarie APA, and prevented Plaintiff from receiving the court-ordered breakup fee to which it otherwise was entitled." (¶ 51.)  Macquarie further asserts that LCI's conduct was "fraudulent, wanton, malicious, or willful in complete disregard of Plaintiff's rights." (¶ 53.)

When the *AC* is stripped of its conclusory allegations, the insufficiency of Count II is laid bare.  Macquarie acknowledges that LCI is engaged in the business of leasing aircraft, (¶ 9), and hence, was Macquarie's competitor.  If LCI induced Lombard to sell it the WAC 9 Assets for its own economic benefit it did not use wrongful means.  Macquarie does not allege that LCI engaged in "physical violence, fraud or misrepresentation, civil suits [or] criminal prosecutions." *Carvel Corp. v. Noonan*, 818 N.E.2d at 1104.  Accordingly, Count II is legally insufficient and is dismissed with prejudice.

### E.    Count III: Violation of Bankruptcy Code § 363(n)

Section 363(n) grants a trustee or debtor in possession the power, *inter alia*, to recover the difference between the sale price and the market value where "the sale price

was controlled by an agreement among potential bidders." 11 U.S.C. § 363(n).[9] The

term "control" means more than causing "an incidental or unintended impact on the

price; it implies an intention or objective to influence the price." *Lone Star Indus., Inc.*

*v. Compania Naviera Perez Companc, S.A.C.F.I.M.F.A. (In re New York Trap Rock*

*Corp.)*, 42 F.3d 747, 752 (2d Cir. 1994). In other words, "[t]he influence on the sale

price must be an intended objective of the agreement, and not merely an unintended

consequence, for the agreement among potential bidders to come within the prohibition

of § 363(n)." *Id.* Generally, such prohibited collusive agreements are secret agreements

that have not been disclosed to the court. *Kabro Assoc. of West Islip, LLP v. Colony Hill*

*Assoc. (In re Colony Hill Assocs.)*, 111 F.3d 269, 277 (2d Cir. 1997) (citing *In re Sasson*

*Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (court was "hard pressed" to find bad faith

when challenged relationship between bidder and debtor "was fully disclosed to the

Bankruptcy Court")).

    While section 363(n) only grants the right to bring a claim to a trustee or debtor

in possession, an unsuccessful bidder may have standing to challenge the actions of a

successful bidder that "destroyed the 'intrinsic fairness' of the sale transaction so that it

was not a good faith purchaser." *Id.* at 274. To challenge the intrinsic fairness of a sale,

the disappointed bidder must allege "that the sale was tainted by fraud, bad faith,

---

[9]    The complete text of 11 U.S.C. § 363(n) is as follows:

        The trustee may avoid a sale under this section if the sale price was controlled by
an agreement among potential bidders at such sale, or may recover from a party to such
agreement any amount by which the value of the property sold exceeds the price at which
such sale was consummated, and may recover any costs, attorneys' fees, or expenses
incurred in avoiding such sale or recovering such amount. In addition to any recovery
under the preceding sentence, the court may grant judgment for punitive damages in
favor of the estate and against any such party that entered into such an agreement in
willful disregard of this subsection.

collusion, deceit, mistake or unfairness." *Wallach v. Kirschenbaum*, No. 11 CV 0795 (SJF), 2011 WL 2470609, at *4 (E.D.N.Y. June 16, 2011) (citing *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 388 (2d Cir. 1997) and *In re Colony Hill Assocs.*, 111 F.3d at 274).

Macquarie lacks standing to assert a claim under section 363(n) as assignee of the Debtors. The *Macquarie Sale Order*, on which Macquarie relies, assigns the Debtors' rights to damages flowing from "violations of the Bidding Procedures and/or the Bidding Procedures Order arising from intentional misconduct" to Macquarie pursuant to the terms of the Macquarie APA. (*Macquarie Sale Order* ¶ 42.) The Debtors did not assign any rights granted under the Bankruptcy Code, specifically, rights under section 363(n). Even if Macquarie had standing, it has not alleged that the Debtors were damaged by the alleged collusion for the reasons already stated. Put simply, Lombard outbid Macquarie, the only other bidder.

Nor can Macquarie challenge the "intrinsic fairness" of the Lombard sale in its own right based on the same allegations of collusion between LCI and Lombard. In objecting to the proposed sale to Lombard, Macquarie argued that Lombard and LCI had colluded. As a result, Lombard was not entitled to a finding that it acted in good faith and Macquarie was entitled to a break-up fee and expense reimbursement. Following an evidentiary hearing at which Macquarie availed itself of the opportunity to cross-examine Ms. McDermott and Mr. Neimann, the Court found that "[a] fair and reasonable opportunity to object to, and be heard with respect to, the Sale Motion and the Sale Transaction has been given to all Persons entitled to notice pursuant to the Bidding Procedures Order," (*Lombard Sale Order* ¶ D), "the Debtors conducted a fair

22

and open sale process[,] the sale process and the Bidding Procedures were non-collusive, duly noticed, and provided a full, fair, and reasonable opportunity for any entity to make an offer to purchase the [WAC 9 Assets]," (*id.* ¶ H), the agreements governing the sale "were negotiated, proposed, and entered into by the Debtors and [Lombard] in good faith, without collusion, and from arms'-length bargaining positions," Lombard "is a 'good faith purchaser' within the meaning of section 363(m) of the Bankruptcy Code" and "complied with the provisions of the Bidding Procedures Order, including compliance in all material respects with confidentiality agreements," the purchase price "was not controlled by any agreement among potential bidders," and "[n]either the Debtors nor [Lombard] have engaged in any conduct that would cause or permit the Purchase Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code." (*Id.* ¶ J.) All affected third parties, including Macquarie, were bound. (*Id.* ¶ 35.) Macquarie did not appeal from the *Lombard Sale Order* which is final.

Macquarie's challenge to the "intrinsic fairness" of the sale is based on the same allegations it pressed at the Lombard sale hearing, constitutes an impermissible collateral attack on the *Lombard Sale Order* and is barred by the doctrine of collateral estoppel.[10] Federal principles of collateral estoppel, which are applied "to establish the

---

[10] Macquarie argues that collateral estoppel is inapplicable because the Court left for another day any claims based on intentional or willful misconduct. (*Objection* p. 17.) Macquarie mischaracterizes the Court's ruling which related to the release that the Debtors were proposing to give Lombard. Because Macquarie was to receive an assignment of certain rights from the Debtors upon the consummation of its own purchase, it was concerned about a potential release of those rights. The Debtors' release of Lombard excepted claims based on willful misconduct or intentional fraud. (*See Lombard Sale Order* ¶ 28.) The claims left for another day referred to claims by Macquarie, as the Debtors' assignee, against Lombard based on intentional wrongdoing. As far as the Court is aware, Macquarie has not brought such claims

preclusive effect of a prior federal judgment," prohibit a party from relitigating an issue where "'(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.'"  *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (quoting *Purdy v. Zeldes*, 337 F.3d 253, 258 & n. 5 (2d Cir. 2003)).

The issue of whether Lombard acted in good faith or colluded with LCI was raised by Macquarie, litigated at length during the February 12 sale hearing and decided against Macquarie.  Macquarie objected to the sale of the WAC 9 Assets to Lombard based, *inter alia*, on the breach of the Lombard NDA, contending that Macquarie was entitled to a break-up fee because the Lombard credit bid was actually a joint venture with LCI.  It cross-examined Ms. McDermott at length on this point.  As noted, the Court found, among other things, that Lombard acted in "good faith" and "without collusion," the purchase price "was not controlled by any agreement among potential bidders," and Lombard had not "engaged in any conduct that would cause or permit the Purchase Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code." (*Lombard Sale Order* ¶ J.)  Macquarie never appealed. If Lombard did not improperly collude with LCI, LCI did not improperly collude with Lombard, and Count III constitutes an impermissible collateral attack on the *Lombard Sale Order.*

---

and cannot show that anything Lombard did hurt the Debtors for the reasons stated.  Furthermore, the release in the *Lombard Sale Order* had nothing to do with LCI or Macquarie's own claims.

*GAF Holdings, LLC v. Rinaldi* (*In re Farmland Indus., Inc.*), 408 B.R. 497 (B.A.P. 8th Cir. 2009), *aff'd on other grounds*, 639 F.3d 402 (8th Cir. 2011), is directly on point.  There, the plaintiff (GAF) had been disqualified as a bidder at an earlier bankruptcy auction.  The bankruptcy court approved the sale to a third party, Coffeyville Resources.  The order approving the sale included findings that Coffeyville made the highest and best offer, the sale procedures had been properly followed, GAF was not a qualified bidder, the consideration was fair and reasonable and the transaction was negotiated in good faith and without collusion.  GAF did not object to or appeal the sale order.  *Id.* at 501.

GAF subsequently learned that Coffeyville had offered the debtor's executive vice president a lucrative position if it acquired the debtor's assets and thereupon filed a motion under Federal Civil Rule 60(b) and Federal Bankruptcy Rule 9024 to vacate the sale order as a product of collusion.  After discovery and a hearing, the bankruptcy court denied the motion.  The bankruptcy court's findings reiterated in some detail that the process was fair and open, untainted by any prospective employment of the debtor's executive vice president and GAF had the opportunity to speak to anyone it chose and conduct due diligence.  *Id.* at 501-02.  GAF did not appeal the denial of its Rule 60(b) motion, or the subsequent bankruptcy court order that authorized an amendment to the sale order and reaffirmed its findings, including that the assets were purchased in good faith and absent a stay pending appeal, would be entitled to the protection of 11 U.S.C. § 363(m).  *Id.* at 502.

Three years later, GAF commenced an adversary proceeding alleging misconduct on the part of various individuals and entities connected with the sale and seeking

damages based on claims sounding in intentional interference with business expectancy and conspiracy.  *Id.*  The defendants moved to dismiss on a variety of grounds, and the bankruptcy court granted the motion concluding that the lawsuit was an impermissible collateral attack on the sale order and failed to state a claim.  *Id.*

The Bankruptcy Appellate Panel affirmed on several grounds, including collateral estoppel.  In order for the bankruptcy court to have entered a judgment for GAF, it would have been necessary to review issues it had already decided and overrule its prior findings.  *Id.* at 506.  GAF had the right to oppose the prior sale order, had unsuccessfully litigated its grievances through its Rule 60(b) motion and never appealed the sale order or the order denying the Rule 60(b) motion.  *Id.* at 506-507.  The issues presented in GAF's tortious interference action were the same as those that had already been litigated and determined by the bankruptcy court in its prior orders.  *Id.* at 506-07.  Accordingly, GAF's actions were barred by collateral estoppel.  *Id.* at 508.

Macquarie's section 363(n) claim is barred for the same reasons.  Macquarie's theory is that Lombard interposed a 100% credit bid based solely on its agreement with LCI to sell the WAC 9 Assets after it consummated the sale from Waypoint.  Thus, their collusive agreement controlled the price of the auction of the WAC 9 Assets.  To grant relief to Macquarie under section 363(n), the Court would have to conclude, contrary to its prior findings, that the sale was unfair, the purchase price was controlled by an agreement between potential bidders and Lombard acted in bad faith.  Accordingly, Macquarie's section 363(n) claim is precluded by collateral estoppel.  Moreover, the cases it cites in opposition to the applicability of collateral estoppel are distinguishable.  *E.g.*, *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2016 WL

4480093, at *2 (S.D.N.Y. Aug. 24, 2016) (refusing to give offensive collateral estoppel effect to a bankruptcy court order that on its face stated it was to have "no force or applicability in any other legal proceeding"); *Elletson v. Riggle (In re Riggle)*, 389 B.R. 167, 175 (D. Colo. 2007), as amended (Aug. 15, 2007) (applying Colorado collateral estoppel law to a state court judgment); *Compagnie des Bauxites de Guinee v. L'Union Atlantique S.A. d'Assurances*, 723 F.2d 357, 361 (3d Cir. 1983) (concluding that collateral estoppel did not apply where the issue had not been actually litigated, but was determined against the party as a discovery sanction); *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 331 & n. 15 (1979) (referring to circumstances where offensive collateral estoppel may be unwarranted).

Finally, Macquarie argues that it did not have a "full and fair opportunity" to litigate in that proceeding because it did not have time to conduct discovery or develop a full record. (*Objection* pp. 19-20.) The argument lacks merit. At the time of the *Bidding Procedures Order* in December 2018, Macquarie still believed that it would acquire the WAC 9 Assets because Lombard was not in the business of leasing helicopters and would not necessarily interpose a 100% credit bid. (¶¶ 21, 22.) On January 23, 2019, however, three weeks before the sale hearing, the Debtors announced that they had received a 100% credit bid from Lombard for the WAC 9 Assets. *(Notice and Identities of Successful Credit Bidders*, dated Jan. 23, 2019, ¶ 7(b) (ECF Main Doc. # 297); *see* ¶ 24.) Two weeks later, and one week before the sale hearing, Macquarie filed the *Macquarie WAC 9 Sale Objection*. It asserted, *inter alia*, that its right to a break-up fee was not affected if a lender and a third party had formed a joint venture to purchase the assets, (*Macquarie WAC 9 Sale Objection* ¶¶ 2, 4 (first bullet point)), and

had "raised these concerns to both representatives of the Debtors and to representatives of the Buyer." (*Id.* ¶ 4 (hanging paragraph).)  Macquarie did not seek discovery or a postponement of the hearing.

Macquarie received Ms. McDermott's declaration a day before the hearing confirming contact with a servicer and discussions about a possible future sale. Macquarie did not ask for expedited discovery to take her deposition before the hearing or a continuance prior to the hearing.  Macquarie accepted her declaration as her direct testimony and cross-examined Ms. McDermott at length about the contacts with LCI.  It was only after all sides rested and during closing arguments at which the Court expressed some skepticism about the evidence supporting Macquarie's objection that Macquarie's counsel suggested that some discovery and a delay might be in order.  The Court denied the request for the reasons already stated.  Furthermore, sales in bankruptcy often happen on an expedited basis, but expedition does not deprive a sale order of its collateral estoppel effect.  *Official Committee of Unsecured Creditors v. CIBC Wood Gundy Ventures, Inc. (In re Temtechco, Inc.)*, No. 95-00596, 1998 WL 887256, at *16 (Bankr. D. Del. Dec. 18, 1998) (ruling that collateral estoppel and *res judicata* barred relitigation of issues that were tried and decided at an expedited sale hearing that occurred three weeks after the chapter 11 petition date).

In this case, Macquarie was a party to the February 12 sale hearing and had a full and fair opportunity to litigate its objections to the sale of the WAC 9 Assets to Lombard based on its alleged collusion with LCI.  The Court overruled those objections and found that Lombard was a good faith purchaser that did not impermissibly collude with LCI. Although aggrieved by the result — it lost its $19.5 million break-up fee and an expense

reimbursement possibly worth $3 million — Macquarie never appealed from the *Lombard Sale Order* which is final. Macquarie's *AC* raises the same collusion issues that were rejected by the Court and memorialized in the *Lombard Sale Order*, and as such, Macquarie's Count III claims asserted as assignee and in its own right are also barred by collateral estoppel.

Accordingly, Count III is dismissed with prejudice.

The Court has considered Macquarie's remaining arguments and concludes that they lack merit. Settle order.

Dated: New York, New York
            September 10, 2019

                                        /s/ *Stuart M. Bernstein*
                                        STUART M. BERNSTEIN
                                        United States Bankruptcy Judge